UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TRINA HILL,

    Plaintiff,

v.

GOODFELLOW TOP GRADE,

    Defendant.

Case No. 18-cv-01474-HSG

**ORDER ON RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Re: Dkt. No. 172

Pending before the Court is Defendant's renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). Dkt. No. 172 ("Mot."). Having carefully considered the papers submitted and oral arguments, the Court **GRANTS IN PART and DENIES IN PART** Defendant's motion.

## I. BACKGROUND

### A. Plaintiff's Role at Goodfellow

Plaintiff Trina Hill started working for Defendant Goodfellow Top Grade Construction, LLC ("Goodfellow" or "Top Grade") on May 9, 2017. Dkt. No. 154 ("Trial Tr. Vol. 1") at 124:16–17. Goodfellow was one of the subcontractors working for Clark Construction, the general contractor, to construct the Chase Center in San Francisco, California. *See id*. at 124:3–125:7. Plaintiff is listed with her union as a "general laborer," a role which entails flagging, shoveling, digging, and "a variety of tasks under labor." *Id*. at 121:17–122:2; Tr. Ex. 4. She primarily works at construction sites. Trial Tr. Vol. 1 at 117:12–13.

Around December 2013, Plaintiff's left lung collapsed and had to be partially removed. *Id*. at 118:14–119:1. As a result of her lung condition, Plaintiff was not capable of performing "general labor physical work" anymore. *Id*. at 119:5–11. Therefore, though her official title was still "general laborer," she was registered with her union for "flagging jobs only." *Id*. at 116:1–4.

Flagging jobs involve directing traffic. *Id*. at 116:5–11. Plaintiff testified that she explained her lung condition to Leonard Garcia, her supervisor at Goodfellow, on June 28, 2017. *Id*. at 132:16–24.

### B. July 13, 2017 Incident with Phallic-Shaped Object and Michael Bounds

On the morning of July 13, 2017, Plaintiff and her colleague, Diana Monroe, discovered a phallic-shaped object at the gate where they worked. *Id*. at 139:15–140:1. The object was not there the night before when Plaintiff departed the worksite around 7:00 p.m. Dkt. No. 151 ("Trial Tr. Vol. 2") at 271:5–272:4. The gate was not locked, and Plaintiff does not know who placed the object there. *Id*. at 272:8–274:1.

Because Ms. Monroe and Plaintiff were the only women working at that gate, Plaintiff felt disrespected upon seeing that object. *Id*. at 141:16–21. She asked Michael Bounds, an employee of another subcontractor, if he placed the object there, and he responded by "lift[ing] up his shirt and pull[ing] his pants down and expos[ing]" himself indecently to Plaintiff. *Id*. at 141:22–142:6. Immediately after, Ms. Monroe reported the Mr. Bounds incident to Justin Porter, the "on-site, on-care health and safety provider." *Id*. at 142:25–143:6. Mr. Porter told Plaintiff to "immediately go report it on the seventh floor to the general contractor, Clark Construction." *Id*. Plaintiff reported the incident to Steve Humphrey, head of safety at Clark Construction. *Id*. at 143:7–22. Mr. Humphrey called Goodfellow and according to Plaintiff, he "didn't offer them a choice but to remove Mr. Bounds from the jobsite." Trial Tr. Vol. 1 at 145:16–146:4. As a result, Mr. Bounds was "immediately terminated." *Id*.

At the direction of Prentiss Jackson, another Clark Construction employee, Plaintiff submitted a statement describing the incident, which Mr. Jackson forwarded to Goodfellow on July 19, 2017. *Id*. at 144:2–21; Trial. Ex. 14. Plaintiff testified that Mr. Jackson removed the phallic-shaped object. Trial Tr. Vol. 2 at 274:17–18.

### C. Statewide Flaggers

Plaintiff testified that on September 5, 2017, Mr. Garcia informed her that Clark Construction "had made a decision to bring in eight non-African American flaggers to replace eight African American local hires." Trial Tr. Vol. 1 at 146:21–147:6. These flaggers were from

1  Statewide. Trial Tr. Vol. 2 at 174:22–175:24. In response to the "Statewide flaggers being
2  brought in," Plaintiff set up a meeting with Mr. Humphrey for the following day, September 6,
3  2017, at 10:00 a.m. *Id*. at 175:24–176:5. At the meeting, Mr. Humphrey told Plaintiff that she
4  "would be staying on for the whole duration of the job, flagging." *Id*. at 178:15–21. After the
5  meeting, Plaintiff ran into Justin Kim and Sean Lennan from Goodfellow and discussed her
6  respiratory issues and the "type of problems I was having with my body." *Id*. at 180:21–181:17.

### D. September 18, 2017 Incident with Maurice Haskell

Plaintiff was working with a co-worker named Maurice Haskell on September 18, 2017. *Id*. at 182:24–183:4. She and Mr. Haskell were both flagging at their respective gates when they simultaneously let their traffic go, almost causing a collision. *Id*. at 183:14–184:5. Plaintiff and Mr. Haskell started arguing, which escalated with Mr. Haskell calling her a gender-linked derogatory term ("b----") and threatening Plaintiff and her family. *Id*. at 185:9–23. Plaintiff testified that she spoke to Mr. Garcia, who told Plaintiff to move to the "middle of the jobsite." *Id*. at 185:24–15. Plaintiff expressed to Mr. Garcia her health concerns with moving to that location, given that the area had a lot of dust, and asked Mr. Garcia why he was not asking Mr. Haskell to move. *Id*. at 186:16–187:19. Mr. Garcia responded, "Trina, that's not your gate. Either you can get your things and move to the middle or you can leave the jobsite." *Id*. at 187:20–22. Plaintiff gathered her things and proceeded to leave the jobsite. *Id*. at 188:1–5.

After Plaintiff left the jobsite, Mr. Garcia started to investigate the altercation between Plaintiff and Mr. Haskell. Dkt. No. 159 ("Trial Tr. Vol. 3") at 415:23–416:4. He called Mr. Lennan to assist in the investigation and they interviewed Mr. Haskell and other workers who witnessed the dispute. *Id*. at 416:5–16. As a result of Defendant's investigation, approximately three days after the incident, Defendant gave Mr. Haskell a verbal "Coach to Correct," informing him that it was "wrong of him to be using inappropriate language on the jobsite directed at other employees, including the word 'b----.'" *Id*. at 417:14–19, 488:11–21.

### E. Plaintiff's Coach to Correct and One-Day Suspension

Plaintiff testified that after her incident with Mr. Haskell but before Plaintiff could leave the jobsite, a Goodfellow supervisor stopped her and told her not to leave, as there was going to be

3

a meeting. Trial Tr. Vol. 2 at 188:8–18. During the meeting, Mr. Lennan issued a written "Coach to Correct Notice" to Plaintiff and suspended her for a day. *Id*. at 189:6–11; Trial Ex. 125. Plaintiff was told that she was being suspended for a day because she was insubordinate and "harsh" with Mr. Garcia. Trial Tr. Vol. 2 at 189:6–123.

After she received the Coach to Correct with the one-day suspension, Plaintiff sought an appointment with a doctor, because she was "overwhelmed with anxiety at this point. It was just one thing after the other with this company." *Id*. at 194:3–12. The doctor's note indicated that Plaintiff would be unable to work from "9/20/17 to 12/20/17." Trial Ex. 111. Plaintiff went back to work against her doctor's recommendation, because she needed to provide for herself and her family. Trial Tr. Vol. 2 at 197:21–24. Plaintiff testified that she disagreed with Defendant's characterization of her behavior and felt that the Coach to Correct and one-day suspension were a "retaliatory tactic," and thus she did not return to work for Goodfellow. *Id*. at 195:22–196:24. Instead, she proceeded to work for other construction companies. *Id*.

### F. Procedural Background

Plaintiff filed this action against Defendant on March 6, 2018, alleging the following claims under Title VII of the Civil Rights Act of 1962, 42 U.S.C. § 2000e, *et seq*.: (1) discrimination on the basis of race; (2) discrimination on the basis of sex; (3) harassment on the basis of race; (4) harassment on the basis of sex; and (5) retaliation. Dkt. No. 1. The parties proceeded to trial, which started on September 10, 2019. At the close of Plaintiff's case, Defendant filed a motion for judgment as a matter of law. Dkt. No. 153. The Court deferred ruling on the motion.[1] Following a six-day trial, the jury returned a verdict in favor of Defendant on the race discrimination, sex discrimination, and race harassment claims, but found in favor of Plaintiff on the sexual harassment and retaliation claims. Dkt. Nos. 162, 166. The jury awarded Plaintiff a total of $18,750 in compensatory damages ($11,250 for the sexual harassment claim and $7,500 for the retaliation claim). Dkt. No. 162.

The Court entered final judgment on September 24, 2019. Dkt. No. 171. Defendant

---

[1] Under Rule 50(b), the Court "submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b).

4

timely filed its renewed motion for judgment as matter of law.

## II. LEGAL STANDARD

"[A] party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)." *Equal Emp't Opportunity Comm'n v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). In considering a renewed motion for judgment as a matter of law, a court must uphold the jury's verdict if "substantial evidence" supports the jury's conclusion. *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Id.* The Court must "view all the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the nonmover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 662-63 (9th Cir. 2015). A court should only grant a Rule 50(b) motion if, after construing all evidence in the light most favorable to the nonmoving party, the record "permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.* (internal quotations omitted).

## III. DISCUSSION

Defendant moves for judgment as a matter of law with respect to the sexual harassment and retaliation claims. The Court addresses each of the claims in turn.

### A. Sexual Harassment

Title VII prohibits sex discrimination, including sexual harassment, in employment. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002). When evaluating a claim for sexual harassment based on a hostile work environment, the court must determine "two things: whether the plaintiff has established that he or she was subjected to a hostile work environment, and whether the employer is liable for the harassment that caused the environment." *Id.* To establish that plaintiff was subjected to a hostile work environment, the plaintiff must show that: (1) she or he was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was

5

unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her or his employment and create an abusive working environment. *Ellison v. Brady*, 924 F.2d 872, 875–76 (9th Cir. 1991). To be actionable, the Supreme Court has held that a "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "When assessing the objective portion of a plaintiff's claim, [the court] assume[s] the perspective of the reasonable victim." *Id*. (citation omitted). Hostility must be measured based on the totality of the circumstances. *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1527 (9th Cir. 1995).

"When harassment by co-workers is at issue, the employer's conduct is reviewed for negligence." *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 875 (9th Cir. 2001) (citing *Ellison*, 924 F.2d at 881). "An employer is liable for a co-worker's sexual harassment only if, after the employer learns of the alleged conduct, he fails to take adequate remedial measures." *Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1483 (9th Cir. 1997). The remedial measures must be "reasonably calculated to end the harassment." *Dawson v. Entek Int'l*, 630 F.3d 928, 940 (9th Cir. 2011) (citations and quotations omitted). The reasonableness of the remedial measures depends on their ability to: (1) "stop harassment by the person who engaged in the harassment;" and (2) "persuade potential harassers to refrain from unlawful conduct." *Id*. Remedial measures may include some form of disciplinary action "proportionate[ ] to the seriousness of the offense." *Id*. at 940–41 (citation and quotations omitted and alterations in original). Even if the harassment independently ceases, inaction "constitutes a ratification of past harassment." *Id*. at 941.

Plaintiff's sexual harassment claim rests on the incidents that Plaintiff testified occurred on July 13, 2017 (concerning the phallic-shaped object placed at the worksite and Mr. Bounds exposing his behind), and the incident with Mr. Haskell on September 18, 2017. Defendant argues that it is entitled to judgment as a matter of law because "three alleged incidents over the course of Plaintiff's four month employment are not sufficiently severe or pervasive." Dkt. No. 174

("Reply") at 4.[2] Further, Defendant argues it took appropriate remedial action in response to any alleged sexual misconduct. Mot. at 10–14.[3]

### i. Severe or Pervasive

To determine whether there was substantial evidence that the unwelcome conduct was severe or pervasive enough to constitute a hostile working environment, the Court considers the totality of the circumstances. *See Fuller*, 47 F.3d at 1527. The Supreme Court has listed "frequency, severity and level of interference with work performance among the factors particularly relevant to the inquiry." *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citations omitted). "The required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Brooks*, 229 F.3d at 926.

Here, the unwelcome conduct amounted to three incidents that happened on July 13 and September 18, 2017, two of which involved different actors (one of whom was not an employee of Goodfellow, based on the evidence presented), and one of which involved an act by an unknown person. Further, Plaintiff presented no evidence connecting any of the events to each other. In

---

[2] Defendant raised this argument for the first time in its reply brief. Although arguments not raised by a party in its opening brief are ordinarily deemed waived, *see Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999), the Court may consider new arguments raised in a reply brief "only if the adverse party is given an opportunity to respond." *Banga v. First USA, NA*, 29 F. Supp. 3d 1270, 1276 (N.D. Cal. 2014) (citations omitted). At the Court's direction, *see* Dkt. No. 172, Plaintiff filed her sur-reply addressing this specific argument, *see* Dkt. No. 181.

[3] Defendant appears to suggest that sexual harassment claims based on a hostile environment are subject to a *McDonnell-Douglas* burden-shifting framework, with the plaintiff having to first establish a "*prima facie*" case before the burden then shifts to the defendant to prove it took appropriate remedial actions. But the Court does not find that the caselaw supports this burden-shifting approach. Instead, the plaintiff must first establish that the alleged misconduct created a hostile environment. *Nichols*, 256 F.3d at 875. Then, depending on the circumstances, plaintiff must also show that there is a basis for holding the employer liable for the harassment, either under a theory of vicarious liability or negligence. *Id*. ("The relevant standards and burdens pertaining to employer liability vary with the circumstances. When harassment by co-workers is at issue, the employer's conduct is reviewed for negligence. When harassment by a supervisor is at issue, an employer is vicariously liable, subject to a potential affirmative defense." (citations omitted)). The Court does not read these cases to suggest that it is the employer's burden to prove it took remedial actions, but rather Plaintiff's burden to prove that the employer should be liable for the acts of its employees (in other words, why those remedial actions were not reasonable).

short, there was no evidence of a "sustained campaign of harassing conducted directed at Plaintiff." *See Ellison*, 924 F.2d at 873–75; *cf. Nichols*, 256 F.3d at 873 (finding a sustained campaign of taunts where co-workers' "habitually called [the plaintiff] sexually derogatory names, referred to him with the female gender, and taunted him for behaving like a woman"). Because this is not a case in which Plaintiff was subjected to a "sustained campaign" of harassment directed at her, the Court must analyze whether, as a matter of law, a reasonable victim would find these three disparate incidents to be sufficiently severe or pervasive to alter the terms of her employment and create an abusive environment.

The Ninth Circuit has held that for a single incident to "support a hostile work environment claim, the incident must be extremely severe." *Brooks*, 229 F.3d at 926 (citing EEOC Policy Guide). The Court does not question that Ms. Hill subjectively believed that "these three distinct incidents in just three months" were humiliating and offensive to her. *See* Dkt. No. 181 ("Sur-Reply") at 1. But the Court does not find that these three disparate incidents were so objectively severe or pervasive as to create an abusive working environment and alter the terms of her employment when measured against the well-settled legal standard. While the Court does not condone Mr. Bounds' or Mr. Haskell's behavior, as a matter of law, these three isolated incidents did not rise to the level of severity the Ninth Circuit has found necessary to establish a hostile working environment. *Compare Little*, 301 F.3d at 967 ("Here, in contrast to the single instance of fondling in *Brooks*, Little was victimized by three violent rapes.") *with Westendorf v. W. Coast Contractors of Nevada, Inc.*, 712 F.3d 417, 419–22 (9th Cir. 2013) (finding as a matter of law in affirming grant of summary judgment that a co-worker's "crude and offensive remarks," which included directing profanity at the plaintiff, making offensive comments about breast sizes, tampons, and sexual activity, and telling plaintiff that she had to "clean the trailer while wearing a French maid's costume (or maid's uniform)" did not rise to the level required to find the "sexual harassment [ ] sufficiently severe or pervasive").

Accordingly, the Court finds that even viewing the facts established at trial in the light most favorable to Plaintiff, the three isolated incidents were not severe and pervasive so as to support a finding that Defendant was liable for sexual harassment under relevant Ninth Circuit

caselaw. The totality of the record demonstrates that the record "permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *See Castro*, 797 F.3d at 662–63.

### B. Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee because the employee has taken action to enforce rights protected under Title VII. *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 730 (9th Cir. 1986). To prove a *prima facie* case for retaliation, a plaintiff must show: (1) that she engaged in a protected activity; (2) she was subsequently subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the employer's action. *Dawson*, 630 F.3d at 936 (citation omitted). "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Id.* (citation omitted). "[O]nly non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 693 (9th Cir. 2017) (quoting *Brooks*, 229 F.3d at 928). If a plaintiff establishes a *prima facie* case of unlawful retaliation, then the burden shifts to the defendant to offer evidence "that the challenged action was taken for legitimate, non-discriminatory reasons." *Id.* (citation omitted). If the defendant provides a legitimate explanation, the burden of production shifts back to plaintiff to show that the defendant's explanation is pretextual. *Id.* (citation omitted).

"An employee engages in protected activity when she opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law." *Westendorf*, 712 F.3d at 422. Plaintiff alleges that she engaged in the following protected activities: (1) reporting the July 13, 2017 incident with the phallic-shaped object and Mr. Bounds; (2) complaining about Defendant replacing local African-American flaggers by Statewide; and (3) complaining about the September 18, 2017 incident with Mr. Haskell. According to Plaintiff, she suffered three adverse employment actions as a result of engaging in the protected activities: (1) on September 6, 2017, Mr. Garcia attempted to walk her to the bottom of the excavation site, known as "the hole," despite knowing that she had concerns about doing dust control because of

9

her respiratory issues; (2) on September 18, 2017, Mr. Garcia directed Plaintiff to move towards the top of the hole or leave the jobsite; and (3) on September 18, 2017, Defendant issued her a Coach to Correct with a one-day suspension.[4]

Defendant contends that it is entitled to judgment as a matter of law as to the retaliation claim because: (1) with the exception of reporting the July 13 incident, Plaintiff does not establish she engaged in protected activity; (2) Plaintiff cannot show causation; and (3) Plaintiff fails to present evidence that Defendant's explanation for the adverse employment action was pretextual. Mot. at 14–16. The Court addresses whether each activity was a protected activity and if so, whether there was sufficient evidence of a causal connection between any protected activity and the adverse employment actions.

### i. Statewide Flaggers

The Court finds that there was insufficient evidence at trial to establish that Plaintiff engaged in a protected activity with respect to the Statewide flaggers. The evidence showed that Plaintiff set up a meeting with Mr. Humphrey from Clark on September 6 at 10:00 a.m. to discuss Statewide flaggers temporarily replacing Goodfellow flaggers. Trial Tr. Vol. 2 at 175:24–176:5. Before that meeting, she talked to Mr. Garcia and reminded him "about her respiratory issues," "collapsed lung surgery," and that she "was dispatched for flagging only." *Id*. at 176:8–17. Mr. Garcia said he would discuss it with Mr. Lennan. *Id*. at 176:18–21. No evidence showed that she mentioned to Mr. Garcia any concern about Statewide flaggers being brought in based on a discriminatory motive.

At the meeting with Mr. Humphrey, Plaintiff recalls:

> Mr. Humphrey assured me that I would be staying on for the whole duration of the job, flagging. That once Goodfellow Top Grade left,

---

[4] Defendant argues that ordering Plaintiff to perform work at the hole does not constitute an adverse employment action in the retaliation context. Reply at 14. But the Court finds that considering all the circumstances and viewing the evidence in the light most favorable to Plaintiff, there was adequate evidence that Defendant knew about her respiratory condition and that Defendant materially altered the conditions of her employment by trying to put her in a less favorable assignment. *Cf. Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994) ("We note in addition that the transfer is just barely—if at all—characterizable as 'adverse' employment action: Steiner was not demoted, or put in a worse job, or given any additional responsibilities. In fact, at first she even claimed to enjoy the day shift.").

10

> I would be moved over up under Clark, which was the general
> contractor, and continue for the duration of the job.

Trial Tr. Vol. 2 at 178:15–21. After the meeting, Plaintiff ran into Mr. Kim and Mr. Lennan and had a discussion with them about the problems she was facing. *Id*. at 180:21–181:17. Specifically, Plaintiff testified that:

> A: The discussion was based on me – well, they started off
> apologizing, Mr. Lennan saying that he didn't know – he wasn't
> aware of my respiratory issues.
> … He told me that nobody was trying to compromise my position or
> nor was my position going to be compromised because of anybody
> else because I explained – I said, you know, my – my job
> performance and my work performance should be based on
> whatever I do, not because of what somebody else's actions was.
> We had a discussion. I told him that it was all overwhelming. That
> my job and my livelihood was being toyed with. It was just too
> much. … I explained to him the type of problems I was having with
> my body and just let them know that, you know, it was too much.
> … Mr. Lennan told me to go home, get some rest, and to report back
> the next morning for work as usual.

Trial Tr. Vol. 2 at 180:18–181:17.

The trial record thus did not establish that Plaintiff engaged in a protected activity with respect to the Statewide flaggers. Critically, the protected activity on which the alleged retaliation is based must be activity prohibited by Title VII. But the evidence showed that the subject of Plaintiff's discussion with Mr. Humphrey (who worked for Clark) was Plaintiff's flagging role. There is no evidence that she discussed her concern that the decision to bring in Statewide was racially motivated. And even assuming Plaintiff expressed concerns to Mr. Humphrey about non-African-American flaggers replacing African-American flaggers, there is no evidence that she then articulated this concern to Goodfellow. Absent such evidence, it is not reasonable to infer, as Plaintiff urges, that she repeated any complaint to Mr. Lennan and Mr. Kim, especially when the evidence that did come in at trial shows that she discussed concerns only about her respiratory health with them. The record thus reflected a complaint about Plaintiff having to perform duties outside of flagging because of the new Statewide flaggers, not a complaint that the Statewide flaggers were replacing the Goodfellow flaggers for a discriminatory purpose. The required nexus to a potential Title VII violation was not present here, and Ms. Hill thus failed to make a *prima*

*facie* showing of protected activity for purposes of this retaliation claim.

### ii. July 13 Incident with Mr. Bounds and Phallic-Shaped Object

Defendant does not dispute that the July 13 complaint regarding Mr. Bounds and the phallic-shaped object was a protected activity, but argues that there was no evidence of a causal link between this incident and any adverse employment action. Mot. at 15.

To prove causation, the plaintiff must show that "her protected conduct was a but-for cause—but not necessarily the only cause—of her [adverse employment action]. *Westendorf*, 712 F.3d at 422 (citation omitted). "Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). The Ninth Circuit has held that in some cases, "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). In order to support an inference of retaliatory motive, "the [adverse action] must have occurred 'fairly soon after the employee's protected expression.'" *Id*. (citation and quotations omitted). While there is no *per se* rule as to what constitutes "fairly soon," the Ninth Circuit has recognized that "a nearly 18-month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation." *Id*.

Here, Plaintiff failed to show a causal link between her July 13 protected activity and Mr. Garcia's actions in attempting to place her close to the "hole" on September 6 and September 18. Nothing in the testimony or the exhibits suggested that Mr. Garcia had knowledge that Plaintiff complained about the phallic-shaped object and Mr. Bounds. There was no evidence that Mr. Jackson forwarded Plaintiff's statement to Mr. Garcia, or emailed his own summary of events to Mr. Garcia. Trial Ex. 14; Trial Ex. 118. Accordingly, there was insufficient evidence that a retaliatory motive contributed to Mr. Garcia's actions on September 6 and 18.

However, with respect to the September 18 Coach to Correct with one-day suspension, based on the totality of the record, a reasonable jury could have determined that Plaintiff's July 13

12

complaint led to the imposition of the Coach to Correct with one-day suspension. Mr. Lennan, who issued and signed the Coach to Correct, was aware of Plaintiff's July 13 complaint. Trial Ex. 118; Trial Ex. 125; Trial Tr. Vol. 3 at 471:17–472:9. And while the Court acknowledges that the temporal gap of almost two months could weigh against a finding of causation, it cannot say that as a matter of law this timing negated the possibility of causation. In some cases, a three-month time difference has been found not to defeat the possibility of a causal link between the protected activity and adverse employment action. *Yartzoff*, 809 F.2d at 1376; *see also Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505 (9th Cir. 1989) (holding that discharges 42 and 59 days after the protected activity were sufficient to infer causation). Based on the evidence that Mr. Lennan knew about the July 13 complaint and was the supervisor who issued the Coach to Correct, as well as the evidence that the Coach to Correct came approximately two months after the protected activity, a reasonable jury could have inferred a retaliatory motive (even though other inferences also would have been consistent with the evidence).

Defendant also contends that it had a legitimate business reason for issuing Plaintiff a Coach to Correct and one-day suspension, and that Plaintiff failed to present any evidence of pretext. Mot. at 16. The Ninth Circuit has held that "evidence of pretext can take many forms," including "the manner in which the plaintiff was treated by [her] employer during [her employment]," the "timing of the [adverse employment action]," and the "disparity in punishment" between the plaintiff and those who did not engage in the protected activity. *See Reynaga*, 847 F.3d at 695. Mr. Lennan testified that he issued the Coach to Correct because Plaintiff was insubordinate, as she walked away from Mr. Garcia and abandoned her post. Trial Tr. Vol. 3 at 464:2–11. But Plaintiff presented evidence that before she complained about sexual harassment, she did not have any trouble with her supervisors, and they praised her for her flagging work. Trial Tr. Vol. 1 at 123:2–11; *see Westendorf*, 712 F.3d at 423 (finding that plaintiff's "*prima facie* case and related inferences might well support a finding of pretext, especially since she had no record of insubordination until she complained about sexual harassment"). Further, Plaintiff received a one-day suspension, whereas Mr. Haskell received a verbal warning. *See* Trial Tr. Vol. 2 at 189:6–24.

13

The Court recognizes that the circumstantial evidence of retaliatory motive presented at trial was not particularly strong, and that the jury could have drawn other conclusions from that evidence. But given the substantial deference the Court must afford the verdict, it finds that Plaintiff presented sufficient evidence from which the jury could reasonably find that the reason for her Coach to Correct was pretextual, meaning that judgment as a matter of law is not warranted on this ground.

### iii. September 18 Incident with Mr. Haskell

With respect to the September 18 incident, Defendant argues that there is no evidence establishing that Plaintiff actually told Mr. Garcia that Mr. Haskell called her the gender-linked profane term before walking her down the hole. The Court agrees. Plaintiff testified that she reported the collision incident to Mr. Garcia:

> Q: Ms. Hill, without saying what Maurice Haskell said at that time, was there a safety incident that you observed with Maurice Haskell that day?
> A: Yes. Because there was no communication between myself and Mr. Haskell, I left my traffic go. He let his traffic go, and there was almost a collision.
> …
> Q: Ms. Hill, did you report this incident to someone?
> A: Yes, I did. … I told Mr. Garcia.
> …
> Q: And what – what did you tell Mr. Garcia at that time? … Without going into what Mr. Haskell had said to you, what did you tell him, Mr. Garcia, at that time?
> A: I told him that Mr. Haskell was being childish and immature and wasn't communicating with me and that there was almost a collision.
> Q: What was Mr. Garcia's response to that?
> A: His response, that was – that part of the conversation I was trying keep out the rest – was a part of when I had to call after the things that was said [sic], so I don't know how I'm supposed to bring that in.

Trial Tr. Vol. 2 at 183:14–184:24. Plaintiff then testified about the altercation between herself and Mr. Haskell, and that Mr. Haskell said the following to her:

> 'B----, you go in the hole,' and then he went on to threaten myself and my family and told me I could call my N----, I could call my nephew, I could call whoever, and I said, 'I'm going to call your immediate' -- ' I'm going to call your immediate foreman.'

*Id*. at 185:19–186:2. When she spoke to Mr. Garcia, Mr. Garcia "said that he would be coming

14

over to the gate where we were at." *Id*. at 186:1–4. Once Mr. Garcia arrived at the gate, "[h]e told me to gather my things and move to the middle of the jobsite," towards the "top of the black hole." *Id*. at 186:5–11.

While there is ample evidence that Plaintiff told Mr. Garcia about her altercation with Mr. Haskell, there is no evidence that she specifically told Mr. Garcia that Mr. Haskell called her a "b----," which is the claimed protected activity, before Mr. Garcia told Plaintiff to go to the middle of the jobsite. During oral argument, when pressed to point to what in the trial record established that Plaintiff reported this specific complaint to Mr. Garcia, Plaintiff's counsel could not do so. Instead, Plaintiff's counsel argued that Plaintiff initially did not testify that she reported Mr. Haskell's use of the offensive epithet to Mr. Garcia because that would necessarily have required her to testify as to what Mr. Haskell said and Plaintiff was afraid that would be hearsay. But to adopt this attorney argument would be to simply presume the truth of the proposition to be proved: that Plaintiff reported the "b----" comment and would have so testified at trial but for her purported fear of providing hearsay testimony.

While there was insufficient evidence of a causal link between Mr. Garcia's action and Plaintiff's reporting of the offensive epithet, the same cannot be said for the September 18 Coach to Correct. Mr. Lennan testified that he had Plaintiff file a witness statement, which he sent to Human Resources "immediately after the incident." Trial Tr. Vol. 3 at 458:23–460:10, 483:13–484:4. The witness statement reports that Mr. Haskell had called Ms. Hill the derogatory term, Trial Ex. 122, and Mr. Lennan, on the same day, issued her a Coach to Correct, Trial Ex. 125 and Trial Tr. Vol. 3 at 471:17–472:9. Given that the Coach to Correct "follow[ed] on the heels of protected activity," there was sufficient evidence from which the jury could find the required causal link between the Coach to Correct and Plaintiff's reporting of the epithet. *See Villiarimo*, 281 F.3d at 1065. And for the same reasons discussed above, a reasonable jury could find that Defendant's proffered reason for the Coach to Correct was pretextual.

\* \* \*

The standard for granting a renewed motion for judgment as a matter of law is high, and the Court must draw all reasonable inferences in favor of upholding the jury's verdict. The totality

15

of the record demonstrates that the jury need not "have relied only on speculation to reach its verdict" with respect to Plaintiff's retaliation claim. *See Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 803 (9th Cir. 2009). Under this deferential standard, judgment as a matter of law thus is not warranted as to Plaintiffs' retaliation claim, because a reasonable jury could find that the September 18, 2017 Coach to Correct was in retaliation for her July 13 and September 18 complaints.

## IV. CONCLUSION

The Court **GRANTS** Defendant's renewed motion for judgment as a matter of law with respect to the sexual harassment claim, but **DENIES** the motion with respect to the retaliation claim. The Court **DIRECTS** the parties to file by February 19, 2020 a joint proposed revised form of judgment consistent with this order.

**IT IS SO ORDERED.**

Dated: 2/11/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge